Robert L. Maple and Dorothy G. Maple v. Commissioner. William M. Smith and Eleanor A. Smith v. Commissioner.
Maple v. Commissioner
Docket Nos. 7176-65, 7186-65.
United States Tax Court
T.C. Memo 1968-194; 1968 Tax Ct. Memo LEXIS 112; 27 T.C.M. (CCH) 944; T.C.M. (RIA) 68194; August 29, 1968. Filed *112 Dean S. Butler, Suite 1100, Wilflower Bldg., 615 S. Flower St., Los Angeles, Calif., for the petitioner. Marion Malone, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' income taxes for the calendar year 1961 as follows: Robert L. and Dorothy G. Maple
$25,004.26
William M. and Eleanor A. Smith
5,015.66
The only issue for determination is whether amounts incurred or expended in connection with the development of orange trees are deductible expenses in the year claimed. Findings of Fact Some of the facts are stipulated and are so found. Petitioners Robert L. Maple and Dorothy G. Maple are husband and wife, residing at the time the petition in this case was filed and at all other relevant times in Whittier, California. Their joint income tax return for the calendar year 1961 was filed with the district director of internal revenue, Los Angeles, California. Dorothy is a party to this action solely by virtue of having signed a joint return with Robert, and reference to Maple as petitioner will hereinafter refer to Robert. Petitioners William M. and Eleanor A. Smith are husband *113 and wife, residing at the time the petition in this case was filed and at all other relevant times in Whittier, California. Their joint income tax return for the calendar year 1961 was filed with the district director of internal revenue, Los Angeles, California. Because Eleanor is a party to this action solely because she signed a joint income tax return, reference to Smith as petitioner will refer to William. In 1961 Maple and Smith were employees of Textron. Maple was an executive in the manufacturing division and Smith was his chief engineer, close friend and investment partner. Donald C. McMillan, during 1961, was a partner in M & M Company (hereinafter referred to as M & M), which company 945 operated a nursery which raised and sold citrus trees and also entered into partnerships which developed and operated citus tree ranches. During the spring of 1961 McMillan and Maple agreed in principal to enter into a partnership arrangement for the purpose of developing and producing an orange grove. Shortly thereafter Smith was included in the partnership arrangement. On or before July 30, 1961, Maple and Smith, along with M & M Company, formed a limited partnership known as Maple Corona *114 Ranch Company (hereinafter sometimes referred to as Corona). Maple and Smith were limited partners, while M & M was a general partner. The purpose of Corona was to organize, develop and operate a citrus tree ranch business. It was envisioned that this would involve the acquisition of land, purchasing young citrus trees, caring for the trees, preparing land for utilization as an orchard, planting the trees, and thereafter operating the orchard through to development of a productive crop producing unit. Under the terms of the agreement, which was not reduced to writing until April 30, 1962, the partners were to contribute capital to the partnership in the following proportions: Maple
50%
Smith
10%
M & M
40%
It was agreed that profits and losses of Corona during 1961 were to be distributed five-sixths to Maple and one-sixth to Smith. For the year ended December 31, 1962, and thereafter the agreement contemplated the sharing of losses in the proportion of the fixed ratio of the partner's capital contributions. On or before December 31, 1961, Maple contributed $65,458.34, Smith contributed $13,091.66, while M & M contributed seedlings valued at $3,244.80 to the partnership. The contribution of *115 Maple and Smith consisted of cash paid directly to Corona by Maple or payments to M & M by him on behalf of Corona. Smith later reimbursed Maple for his share of the payments. The capital contributions paid by Maple for himself and Smith were made as follows: 9/15/61
$46,600
9/15/61
$10,400
11/17/61
$ 8.000
12/26/61
$13,550
During 1961 Corona and M & M entered into an oral agreement whereby Corona would purchase seedlings in a "lined" state from M & M and M & M would then agree to develop the seedlings into orange trees capable of being transplanted to an orchard. Under the terms of the agreement 26,000 seedlings were purchased from M & M at a cost of $7,800, or 30 cents each. In return for developing the seedlings into suitable trees for planting, M & M was to receive $63,700, payable by December 31, 1961. M & M agreed to be responsible only for those losses due to factors under its control. Corona was to bear all other risks. It was not a general practice for those purchasing trees for transplanting to orchards to bear any risk of loss prior to transplanting. However, at the time the above agreement was entered into there was a shortage of trees and M & M had the power to dictate the terms *116 upon which it would agree to supply the trees. On September 15, 1961, the tree growing agreement was reduced to writing as follows: 5/29/62 RHM (5) TREE GROWING CONTRACT This Tree Growing Contract made and entered into this 15th day of September, 1961, by and between M & M Company, a Limited Partnership, hereinafter referred to as "Growers" and Maple Corona Ranch Company, a partnership, hereinafter referred to as "Owner." 1. In June, 1961, the parties hereto entered into certain oral understandings relating to the raising of trees by Growers for Owner and wish to reduce their various understandings to writing. Growers are engaged in the business of planting and growing citrus trees and other nursery stock. "Citrus Seedlings" as used herein means unbudded growing citrus trees approximately one year old. "Owner stock" as used herein means young citrus trees of Owner being grown and prepared for orchard planting by Growers on Growers' own land as hereinafter described. THE PARTIES HAVE AGREED: 2. Growers agree to grow to planting stage, using Growers' customary nursery practices, the following Owner stock, consisting of 25,000 trees heretofore purchased by Owner from Growers on Growers' *117 invoice number 2262. 3. As consideration for growing Owner stock to planting stage, Owner shall pay to Growers the total sum of $63,700.00 payable according to the following schedule: September 15, 1961
$23,050.00
October 15, 1961
$19,000.00 946 the balance to be paid on or before December 1, 1961. In the event any taxes are applicable to this transaction, they shall be paid by Owner. 4. Growers agree to furnish buds for Owner stock as follows: 5/28/62 RHM (5) Fifty per cent (50%) of the trees to be budded to Valencia Nucellar, Olinda and Campbell; and Fifty per cent (50%) of the trees to be budded to Naval Frost Nucellar. 5. Growers agree to furnish all necessary labor, equipment, water, fertilizer, insecticides and equipment to bring Owner stock to planting stage. When Owner stock reaches planting stage, Growers agree to dig the trees and transport them to roadside at Growers' premises. 6. Owner shall not be obligated to pay for the growing or budding of any of Owner stock hereunder which at digging time does not have a growing bud or which has a growing bud which is smaller than it is feasible to dig when compared to other buds in the same lot of trees unless such condition is caused *118 by risk assumed by Owner under paragraph 7. Any trees which Owner is not required to pay for hereunder shall become the property of Growers and Growers shall credit Owner with the pro rata amount paid (or to be paid) with respect to such tree or trees. Failure of Owner to inspect the trees when requested to do so or to notify Growers of trees for which no payment is due hereunder shall operate as a waiver as to the provisions of this paragraph by Owner. 7. Growers take full responsibility for all matters under Growers' control. All risk of loss or damage to Owner stock or any failure to reach planting stage by the delivery date hereinafter specified by reason of any matter or thing not under the control of Growers, including, but not limited to, adverse weather, quarantine, floods, labor shortage or war shortages shall be at Owner's risk. 5/28/62 RHM (5) 8. Owner agrees that the number of trees above is approximate and subject to verification at time of digging. Amounts payable hereunder shall be adjusted according to the above schedules when the exact quantities have been determined. Payment for any overage shall be due when determined; provided, however, that Owner shall not be obligated *119 in any event, to take delivery or pay for the growing of more trees than are specified in paragraph 2 above. 9. Owner shall take delivery of all trees hereunder on or before May 31, 1962, and failure to take delivery by said date shall be a default hereunder. 10. It is expressly understood and agreed that it is the essence of this contract that this contract is for services only. In the event of any default of Owner hereunder, including failure to make payments when due or failure to take delivery on or before the date provided in paragraph 9, Growers may, upon 30-days written notice of defualt to Owner, if Owner fails to cure such default within such time, dig Owner stock and destroy the same without liability to Owner of any kind. In the event Owner defaults, it is agreed that all amounts theretofore paid to Growers or [sic] for services and materials used in growing Owner stock and not for the purchase of Owner stock and such amounts shall be retained by Growers for said services. In the event Owner is not otherwise in default hereunder, but fails to take delivery as provided in paragraph 9, Growers agree upon Owner's written request made within the 30-day period of written notice, *120 to hold and care for Owner stock for an additional period of not to exceed 60 days provided Owner, at the time of making such request, pays to Growers in advance the sum of $.25 per tree per month for all trees held over. At the expiration of such additional period, if Owner has not taken delivery, Growers may dig and destroy said trees as herein provided. Dated: September 15, 1961. MAPLE CORONA RANCH COMPANY By (Signed) Donald C. McMillan OWNER M & M COMPANY By (Signed) Donald C. McMillan GROWERS No explanation of the symbol "5/29 or 28/62 RHM (5)" is in evidence. The figure of 25,000 trees was intended to cover all 26,000 trees subject to the earlier agreement. At the time M & M sold the seedlings to Corona and the tree growing agreement was entered into, the seedlings had been in the "lined" state for one year. A seedling is considered in the lined state after a seed has been planted, raised for a year, had its roots inspected and been replanted for further growth. At the time the trees in question were purchased, the seedlings were 2 years old. Orange trees are not grown from seeds of edible orange trees. They are grown from 947 seeds taken from citrus trees, which produce a *121 fruit which is inedible. These seedlings are called "rootstock" because they provide excellent roots for fruit-producing citrus trees. The trees are converted into edible orange trees through a process of grafting a bud from an edible orange tree (called "budding") to the rootstock. The bud is inserted in a slit in the seedling and allowed to develop. When it has reached the proper height the top part of the rootstock is bent over and forced to die so that only the growth from the bud and the original roots remain. This process is called "lopping" and it allows the entire development of the tree to be concentrated in developing the growth of the bud into a top part producing edible fruit. A tree is not generally ready to be transplanted to a permanent location in an orchard for approximately one year after it has been budded. During this time certain cultural practices are performed, including fertilizing, cultivating, spraying and weeding, in order to guarantee that the tree will be healthy, have a straight trunk, and develop a large leaf area. When the tree is ready to be transplanted to the orchard, it is dug up with a ball of earth adhering to the roots and wrapped in a burlap *122 bag. This process is called "balling." In the instant case the trees Corona purchased had not yet been budded. Before they could be planted in an orchard and grown to maturity, they had to have an additional year's care which included budding, lopping, and balling the tree. The charge to Corona for the various functions required was $2.45 per tree, which amount, when added to the 30 cents cost per seedling, made a total of $2.75 for each tree developed to a transplantable stage. The cost was in line with the selling price of similar trees ready for transplanting. Though it is difficult to determine the exact cost of each step in raising a tree for planting, the cost of balling is generally about 30 cents a tree, and budding a tree costs anywhere from 0 to 15 cents per bud and 5 cents for the labor involved. As an ultimate finding of fact, the cost of balling the trees in the instant case was 30 cents per tree. The cost of budding the trees was 12 cents per tree. Corona's seedlings were budded in July or August, 1961. Most of the labor cost of raising the trees, with the exception of balling, took place in 1961. As an ultimate finding of fact, services amounting to $1.20 of the post *123 budding total per tree of $2.33 were rendered by M & M in 1961. Though the tree growing agreement called for delivery of the trees on or before May 31, 1962, the trees were not taken by Corona until August and September of that year. The delay was occasioned by the inability of Corona to obtain a suitable orchard in time to plant the trees at the agreed upon delivery date. During 1961 a number of agreements were entered into for the purpose of obtaining a suitable orchard site. The partnership originally entered into an agreement to lease 100 acres of land called the "Horse Thief Canyon," on which M & M had a master lease. However, this was not considered to be advantageous. It then purchased 160 acres of unimproved real property called the "Waiss" property. For reasons unexplained, this property was also discarded as a site for the orchard in favor of a third parcel containing approximately 500 acres called the "Steel Valley" property. This property was not conveyed to Corona until February 1962. It was not until August 1962 that a water supply system was installed on the land and the trees could not be planted until that operation was completed. When the trees were planted they were *124 spread over an area of 140 acres. On April 12, 1962, Corona filed its "Partnership Return of Income" for the year commencing July 30, 1961, and ending December 31, 1961. Sometime prior to April 12, 1962, a certified public accounting firm analyzed and summarized Corona's transactions for the period ending December 31, 1961, on a work sheet. This work sheet constituted the books and records of Corona for that period of time, and accurately reflected the amounts received and expended by Corona in regard to its transactions with M & M. As regards the transactions with M & M in regard to the development of the seedlings, the analysis shows that of the $7,800 plus $312 sales tax which Corona was required to pay for the 26,000 seedlings and the $63,700 which was to be paid under the tree growing contract, a balance of $7,626.40 was outstanding at December 31, 1961. The $63,700 amount was considered an expense for the year 1961 and broken down into component costs of labor - 76 percent, supplies - 6 percent, fertilizer - 6 percent, utilities - 2 percent, and equipment rental - 10 percent. 948 On Corona's Partnership Return of Income for the year ended December 31, 1961, the Schedule L balance *125 sheet accounts and amounts are identical to those shown on the work sheet analysis, including $7,626.40 as the amount for accounts payable. Schedule L. - BALANCE SHEETS
ASSETS
Amount
Total
Cash
$17,609.20
Buildings and other fixed depreciable assets Trees
$8,112.00 8,112.00
Total Assets $25,721.20
Accounts payable
7,626.40
Partners' capital accounts Total Liabilities and 18,094.80
Capital
$25,721.20
Schedule M, "Reconciliation of Partners' Capital Accounts", reads as follows: [1]
1.[2] 2. Capital contributed during year
3.[2] 4. Ordinary income (or loss) from line 26 page 1
5.[2] 6.[2] 7. Capital account at end of year
(a)
65,458.33
(53,083.33)
12,375.00
(b)
13,091.67
(10,616.67)
2,475.00
(c)
3,244.80
3,244.80
(d)
(e) On a schedule titled "Farm Expenses for Taxable Year" [3] *126 the total expenses shown are $63,700, broken down in the same manner as on the work sheet analysis. The work sheet analysis and the partnership return of income were intended to be and were prepared on an accrual method of accounting. No income was received during 1961, consequently the $63,700 amount shown as expenses was also shown as the net loss of the partnership. This amount was allocated on Schedule K, "Partners' Shares of Income, Credits, and Deductions," five-sixths to Maple and one-sixth to Smith, or $53,083.33, and $10,616.67, respectively. On their individual income tax returns for the calendar year 1961, Maple and Smith, respectively, reported the above amounts as losses from the partnership and reduced their taxable income accordingly. In his statutory notices of deficiency, respondent disallowed these losses as deductions from petitioners' taxable incomes on the ground that there was no distributable income or loss from the partnership in 1961. Ultimate Finding of Fact Maple Corona Ranch Company incurred a loss of $31,200 for the year *127 ended December 31, 1961. Of that amount Robert Maple and William Smith are entitled to deduct $26,000 and $5,200, respectively, as losses from partnership operations for the calendar year 1961. Opinion Petitioners contend that in June 1961 they became engaged in the business of developing an orange-tree orchard when they established the Maple Corona Ranch Company, and thereafter, during 1961, incurred costs of $63,700 for development of seedlings to be placed in a producing orchard. They argue that under section 162 of the Code [4] and section 1.162-12, Income Tax Regs., they are entitled to deduct those costs in 1961. Respondent concedes that Corona was created exclusively for the purpose of developing and operating a citrus tree ranch business and was engaged in this business during the year. He also does not dispute petitioners' contention that section 1.162-12, Income Tax Regs., pertaining to expenses of farmers, *128 is applicable to them. What he does deny is that there is any language within that regulation which allows petitioners to deduct the expenses in question. The language of section 1.162-12, Income Tax Regs., relevant to this issue, reads as follows: 949 Amounts expended in the development of farms, orchards, and ranches prior to the time when the productive state is reached may be regarded as investments of capital. * * * The above provision has been a part of the regulations for over forty-five years. For its history see Estate of Richard R. Wilbur, 43 T.C. 322, 324 (1964). As we pointed out in Wilbur, the regulation allows a taxpayer to have the option of deducting those expenses which, if incurred while an orchard was in a productive state, would be deductible. In Wilbur the expenses of this nature included cultural expenditures in the form of irrigation, cultivation, pruning, fertilizing, spraying, and other care expenses incurred prior to the time that the trees were fruit producing. We pointed out that the Treasury Department has recognized that such expenses as these, prior to production are in the gray area between purely capital expenditures and expenses readily identifiable *129 as a charge against current income. The activities envisaged by the regulations are those which are usually considered to generate current expenses because the amounts expended merely represent current maintenance of an existing asset and are thus within the category of those expenses generally considered deductible. From another point of view, these expenses are part of the cost of acquiring a producing orchard and because they are a part of that cost, would be in that category of expenses which must be capitalized. Consequently, because of the dual nature of such expenditures, the taxpayer has been given the option to elect the treatment most advantageous to himself. Unless the expenditure is clearly of deductible expense character or falls within the gray area between capital expenditures and deductible expenses, there is no option. In Mim. 6030, 1946-2 C.B. 45, respondent set forth his position in regard to which expenditures incurred in the development of an orchard are subject to the election. It reads as follows: Amounts expended in development of farms, orchards, and ranches. Treasury Department, Office of Commissioner of Internal Revenue, Washington, D.C., June 20, 1946. *130 Collectors of Internal Revenue, Internal Revenue Agents in Charge, Heads of Field Divisions of the Technical Staff, and Others Concerned: Section 29.23(a)-11 of Regulations 111 provides in part: Amounts expended in the development of farms, orchards, and ranches prior to the time when the productive state is reached may be regarded as investments of capital. It has come to the attention of the Bureau that many taxpayers, accountants, and attorneys have construed this provision of the regulations as permitting the taxpayer to capitalize or to charge to expense, at his option, amounts expended in the development of farms, orchards, and ranches prior to the time the productive state is reached, regardless of whether the items represent investments of capital or ordinary and necessary business expenses. The contention that capital items may be expensed, at the option of the taxpayer, is based upon an interpretation of article 110 of Regulations 62 (identical with section 29.23(a)-11 of Regulations 111 insofar as the above-quoted provision is concerned) which was published as I.T. 1610 (C.B. II-1, 85 (1923)), to the effect that the taxpayer has the option of charging the expenditures *131 in question to expense or of capitalizing them. Section 24(a)(2) of the Internal Revenue Code provides that no deduction shall be allowed in any case in respect of "Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." It is the position of the Bureau that a correct interpretation of section 29.23(a)-11 of Regulations 111 gives the taxpayer the option to capitalize, prior to the time when the productive state is reached, expenditures incurred during the period of development which might otherwise be deductible as current expenses, but it does not permit capital items to be treated as ordinary and necessary business expenses. Typical items which are required to be capitalized, and to which the option does not apply, are such preparatory expenditures as the cost of clearing brush, trees, and stumps; leveling and conditioning land; the cost of trees and the planting of trees; drilling and equipping wells; building irrigation canals and ditches; laying irrigation pipes; installing drain tile or ditches to prevent erosion; straightening creek beds to correct erosion; constructing earthen, masonry, or concrete *132 tanks, reservoirs, dams, or ditches; building roads; and the cost of physical equipment having a life in excess of one year. Expenditures incurred during the development period which represent ordinary 950 and necessary expense items as an incident of current operations, such as the upkeep of a grove or orchard, taxes, water for irrigation purposes, and cultivating and spraying of trees may, under the provisions of section 29.23(a)-11 of Regulations 111, be either capitalized or deducted at the election of the taxpayer. Where, however, with respect to taxable years beginning prior to July 1, 1946, taxpayers have, in their returns, treated the above-mentioned preparatory expenditures as ordinary and necessary expenses, such treatment will not be disturbed, and the rule stated in this mineograph with respect to preparatory expenditures will be applied only with respect to such costs incurred for taxable years beginning on or after July 1, 1946. For purposes of this paragraph, capital items such as farm machinery, equipment, buildings, automobiles, and work, breeding, or dairy animals will not be allowed as ordinary and necessary expense deductions, regardless of the treatment thereof *133 by taxpayers in their returns. I.T. 1610 (C.B. II-1, 85 (1923)) is revoked. Respondent has recently declared Mim. 6030 obsolete and not considered determinative for future transactions, Rev. Rul. 67-123, 1967-1 C.B. 383, [5] *134 however, on brief, he continues to rely upon the ruling for the instant case. Respondent's position is that under the theory of Mim. 6030, the costs of raising a tree from a seedling to the point where it can be transplanted to an orchard are preparatory. He sees preparatory expenses as expenditures which are "initial, nonrecurring, basic, one-shot expenses or an expense that is capital in nature or is a component of the cost of acquiring a complete capital asset." He contends further that the conversion *135 of a seedling into a citrus-producing tree requires special skills, processes, and an environment which are all different from those which are required after a tree is placed in an orchard, and all of which skills and processes make the tree more valuable. Consequently, he argues, they fit the definition of "preparatory" and their cost must thus be capitalized. We cannot agree with respondent. An examination of typical expenditures which seemingly fall into respondent's definition of "preparatory" shows that in many instances the amounts spent are deductible when they pertain to the raising of agricultural commodities such as livestock, crops and timber, as well as orchards. In the livestock area, the cost of feed used to nourish cattle and other expenses incurred in raising livestock are part of the cost of obtaining marketable stock, and such expenditures do help to increase the herd's value. Undoubtedly some activities, such as branding, are unique and one-shot in nature, However, section 1.162-12, Income Tax Regs., states that the cost of feed and other costs are allowable as a deductible expense when incurred. Similarly, in the case of developing orchards, as shown by the Richard *136 R. Wilbur case, supra, many cultural expenditures incurred in developing an orchard are part of the cost of obtaining a producing orchard. Some of the expenditures, such as pruning the trees, directly benefit them by improving and controlling their growth. But, as is shown by Wilbur, there is no question that historically these expenditures are currently deductible by the grower if he so wishes. Respondent has specifically ruled that when a nursery raises trees, all growing expenses, regardless of whether or not they improve the value of a tree, are required to be deducted until such time as the trees become marketable. I.T. 1368, 951 I-1 C.B. 72 (1922). Cf. Amling DeVor Nurseries, 139 F. Supp. 303 (D. Cal. 1956). Shearing and pruning expenditures incurred in raising timber are similarly deductible despite the fact that they may be one-shot in nature and improve the value of the trees. See Ransburg v. United States, 281 F. Supp. 324 (D. Ind. 1967), and the cases cited therein. As the above examples show, the term "preparatory expenditures" has little to do with the uniqueness of an operation performed on a crop or with the value which an operation adds to it. In its historical context, *137 the term "preparatory expenditures" refers to those expenditures incurred prior to raising agricultural commodities. A "preparatory expenditure" is incurred so that a farmer may begin the growing process. A "developmental expenditure" is incurred by the grower so that the growing process may continue in a desired manner. Viewing preparatory versus developmental expenditures in this manner, the examples in Mim. 6030, the regulations, and the various cases decided in the farming and timber area are reconcilable. Cultural expenses were deductible in Richard R. Wilbur, supra, because they pertained to growing existing trees. But land clearing expenditures and the cost of planting trees in Thompson & Folger Co., 17 T.C. 722 (1951), and H. L. McBride, 23 T.C. 901 (1955), were incurred in order that trees could be grown by the taxpayer and were thus required to be capitalized. Similarly, though section 1.162-12, Income Tax Regs., allows the cost of feed and other costs connected with the raising of livestock to be deducted as a current expense, the same regulation requires the purchase price of the livestock to be capitalized because the cost of the cattle is a cost incurred to enable a *138 farmer to raise stock to a marketable stage. Section 1.611-3(a), Income Tax Regs., requires planting costs of timber to be capitalized, as the cost of same is incurred prior to growing the trees, but as shown by the decision in Ransburg, supra, not those expenses incurred in developing the actual growth of the trees. In the instant case, the question therefore is not what was done to the trees before they were transplanted to Corona's orchard; the question is whether the expenses were incurred by Corona as a cost of growing orange trees in 1961 or whether they were incurred in order that it could begin to grow the trees. Only if they were the latter are they required to be capitalized. The first question in this regard is whether Corona began growing the trees prior to the time they were transplanted to the Steel Valley property. The determination of this question depends in large part upon the extent to which Corona bore the risk of loss of the seedlings. If M & M took all risks of the seedlings' destruction, then M & M's costs would be the costs incurred in raising the trees - not Corona's. However, if Corona bore the risk of loss of the seedlings during their development, then Corona's *139 expenditures would be the expenditures incurred in raising the orange trees. The major risk in farming is the loss of a crop due to unforeseen circumstances. Without assuming this risk, one cannot be considered in the business of farming, nor can his expenditures be considered farming expenditures. Cf. sections 1.61-4(d), 1.182-2, and 1.175-3, Income Tax Regs.
Respondent contends that in fact Corona assumed no risk of loss of the seedlings, asserting that all of the agreements relating to their purchase were drawn up after the trees were ready to be transplanted to the Steel Valley property. He points out that despite the fact that the tree growing contract set out in the findings of fact was dated September 15, 1961, and it recited an earlier oral agreement dated in June of the same year, the symbols 5/29 and 28/62 RHM (5) appear on the top of each page. He interprets these symbols as indicating that the contract was actually entered into on May 28, 1962, and that RHM stands for the typist's initials. On May 28, 1962, the trees were ready or almost ready for delivery and respondent contends that this was the earliest Corona actually agreed to buy anything or assume any risk of loss. *140 We have found that the tree growing agreement substantively set forth the actual terms of an agreement entered into in June, 1961. The testimony of Robert Maple and Donald McMillan was that the writing took cognizance of the situation existing in June, and the terms set forth in the written agreement were those agreed upon in June. Both men impressed us as truthful individuals who at times seemed to be bending over backward to relate exactly the relevant incidents as they occurred, whether or not helpful to their positions. In addition to the testimony presented, we have in evidence 952 canceled checks showing payments in 1961 to M & M from Corona which, in light of all the evidence presented, could only have been for the tree-care services. The various attempts of petitioner to find a location for the trees in 1961 also lends weight to the proposition that they were anxious to have land available for the trees which they owned in that year. Allocation of risk of loss is provided for in paragraphs 6 and 7 of the tree growing agreement. Paragraph 7 states that Corona assumed all risk of loss due to conditions not under the grower's control. Paragraph 6 exempts Corona from paying for *141 growing or budding a tree which had too small a bud, but this relief was granted only if the bud's failure was not caused by one of the risks Corona assumed in paragraph 7. We find that the provisions of paragraph 6 are no more than a warranty of competency of M & M, and that Corona retained general liability for potential destruction of the trees. Thus we have found that the costs incurred by Corona under the agreement were farming expenditures subject to the provision of section 1.162-12, Income Tax Regs.
The next question es which of the expenditures under the tree growing agreement constituted nondeductible preparatory expenditures and which were deductible developmental expenditures. With the exception of budding the seedlings, the services performed by M & M set forth in the findings of fact were clearly related to the natural development of a growing orange tree. The expenditures for the services are developmental expenditures as indicated by the discussion above, and we so find. The budding expenditures cannot be similarly classified. As shown in the findings of fact, a producing orange tree is actually a combination of two trees; a root stock grown from a seed, and a top part *142 grown from a bud inserted in the root stock. Though the result of combining the two trees is one producing orange tree, the fact is that parts of two different trees are grown. Petitioners have treated the cost of the root stock as a capital expenditure. Under the rationale of Mim. 6030 and H. L. McBride, supra, this treatment is required, as the purchase and planting of seedlings is preparatory to growing the stock. Similarly when the bud is purchased and grafted to the root stock, the cost of same is a preparatory expenditure, because it is a cost preparatory to being able to develop the bud into a top part. Though the top part eventually nourishes the root stock and aids in its development, the purpose of budding is to develop the bud as a new growth of its own. The cost of the operation is a cost incurred to prepare the bud to grow, not to further develop its growth. Under the distinction between preparatory and developmental expenditures, which we have illustrated, the cost of the budding processes is to be treated as a capital expenditure. It is a peculiarity of an orange tree that its component parts are planted in two separate operations. We find no reason to treat the cost *143 of the first in time differently from the second merely because one was done before the other. We have determined that the cost of the budding process was 12 cents per tree, or $3,120. This amount is a substantial part of the $63,700 growing fee, cannot be considered a de minimis cost, and consequently is not deductible. As stated above, the remaining amount due under the growing contract, $60,580 represents developmental expenditures which are deductible in the year the services were rendered. However, some of the services under the contract were not rendered by M & M or paid for by Corona in 1961. At trial and on briefs, the parties have been unable to agree as to whether Corona was on the cash basis method of accounting or an accrual basis. Corona's records indicate that as much as $7,626.40 remained payable on the tree growing contract at the end of 1961. If Corona were on the cash basis any deductible amounts represented by that balance would not be deductible until paid, regardless of when the services were rendered. We have found, and now hold, that Corona was on an accrual basis. The records for 1961 were prepared by a CPA firm and they reflected the $63,700 cost of the tree *144 growing contract as an expense, along with an account payable to M & M at the end of the period for the unpaid balance. This is a presentation characteristic of an accrual method of accounting, which method recognizes expenditures in the year a liability is incurred, as opposed to the cash receipts and disbursements method which recognizes them only when cash is paid. Respondent in attempting to show that petitioner was on the cash basis points out that though agreements to purchase 953 the Waiss property were entered into in 1961, the property was not reflected on the work sheet as an asset, even though a liability was incurred. However, because we do not know when title or possession passed to Corona, the failure to record the land as an asset in 1961 does not necessarily mean that Corona was not on the accrual basis. See Commissioner v. Segall,, 114 F. 2d 706 (C.A. 6, 1940), reversing on other grounds 38 B.T.A. 43 (1938). Varo U. Smith, a certified public accountant, testified that in his opinion the books and records of Corona were on an accrual basis and we agree with him. Despite the form of petitioner's books and records, respondent contends that Corona filed its income tax *145 return on the cash basis. The only reason cited for this assertion is the schedule showing its 1961 expenses which was included in its return and which is fully described in our findings. This schedule indicates only that Corona was transposing the figures used on its work sheet to its income tax return, and there are no discrepancies. Section 446(a) of the Code provides that "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." We have found that Corona kept its records on an accrual basis. This method of reporting was thus required on its income tax return under 446(a). Even if there were an attempt to report income on the cash receipts and disbursements method, Corona was required to file and we are required to treat Corona as if it were on an accrual method of accounting. Bancroft, et al. v. United States, 49 F. Supp. 476 (Ct. Cl. 1943). Therefore, because the tree growing contract called for payment of the full $63,700 in 1961, we find that under its accrual method Corona properly recognized that amount as an expenditure in that year. Of course, proper recognition of $63,700 as *146 an expenditure in 1961 does not mean it is fully deductible as an expense. We have already found $3,120 of that amount, representing budding costs, is to be capitalized. In addition, we find that part of the remainder represents a deferred expense. We have found that tree growing services other than budding costs represented $1.20 of the $2.45 growing cost per tree in 1961 - or a total of $31,200 for the 26,000 trees. The remaining $29,380 was payment for services rendered in 1962. Though payment was required in 1961 for these later services, the fact that they were not performed in 1961 requires us to find that they were not deductible in that year - the only year before us. Payments for services to be rendered in the future are deductible only when the services are performed. This includes farming expenditures as well as expenditures in other areas. Tim W. Lillie, 45 T.C. 54, 62 (1965); Farming Corporation, 11 B.T.A. 1413 (1928); Syracuse Washing Machine Corp., 17 B.T.A. 11 (1929). Therefore, of the $63,700 deducted by petitioners, we find that $31,200 represents deductible expenditures and a loss for the year by Corona in 1961. Allocating the loss five-sixths to Maple and one-sixth *147 to Smith in accordance with their profit sharing agreement, they are entitled to deduct the amounts of $26,000 and $5,200, respectively. Decision will be entered under Rule 50. Footnotes
1. Line (a) refers to Maple, (b) to Smith and (c) to M & M. ↩
2. The column captions of Schedule M read as follows: Column 1 - "Capital account at beginning of year," Column 3 - "Income not included in column 4 plus nontaxable income," Column 5 - "Losses not included in column 4, plus unallowable deductions," Column 6 - "Withdrawals and distributions."↩
3. This schedule is on the bottom half of one page taken from a 1040F (farm) return form. The top half of this same page is titled "Farm Income for Taxable Period Computed on Cash Receipts and Disbursements Basis." No items were entered therein.
4. All references are to the Internal Revenue Code of 1954. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *.↩
5. Mim. 6030 was included in a list of rulings published after the following headnote: Rev. Rul. 67-123
In accordance with the program announced in Revenue Procedure 67-6, page 576, this Bulletin, for the review of rulings published prior to 1953, it has been found that listed rulings relating primarily to engineering issues are not determinative with respect to future transactions, and they are declared to be obsolete. Revenue Procedure 67-6, page 576, this Bulletin, announced a program for reviewing rulings published in the Internal Revenue Bulletin prior to 1953 for the primary purpose of identifying and declaring obsolete those rulings which, although not specifically revoked or superseded, are not considered determinative with respect to future transactions. In accordance with that program, a review has been made of those rulings dealing primarily with engineering matters, and it has been found that certain rulings are not determinative with respect to future transactions because (1) the applicable statutory provisions or regulations have been changed, (2) the ruling position is specifically covered by statute or regulations, or (3) the facts set forth are not sufficient to permit application of the current statute and regulations. Therefore, the rulings listed below are hereby declared to be obsolete. * * * We do not attempt to explain the specific reason for respondent's ruling. We do note that Mim. 6030 contains provisions relating to tax returns pertaining to years prior to 1946 as does a companion ruling, Mim. 6030 (Supp. 1) (also declared obsolete), 1948-1 C.B. 42↩, which provisions no longer have revelance to subsequent years.