**Arnold R. and Marion R. BLITZER**

v.

**The UNITED STATES.**

No. 426–76.

United States Court of Claims.

July 14, 1982.

---

13. 28 U.S.C. § 1506 (1976).

875

Bruce S. Lane, Washington, D. C., attorney of record, for plaintiffs. Jack M. Feder, Barbara Sarshik, Lane & Edson, Washington, D. C., Ronald L. Rosenfield, and Spero & Rosenfield Co., Cleveland, Ohio, of counsel.

Bruce W. Reynolds, Washington, D. C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D. C., for defendant. Theodore D. Peyser, Jr., Donald H. Olson and Micheal G. Lichtenberg, Washington, D. C., of counsel.

Ralph A. Muoio, Washington, D. C., attorney of record, for amicus curiae Touche Ross & Co. Leon E. Irish, Albert G. Lauber, Jr., Daniel N. Shaviro, Caplin & Drysdale, Washington, D. C., Jeffrey H. Miro, Martin L. Katz and Miro, Miro & Weiner, Bloomfield Hills, Mich., of counsel.

William C. Gifford, Washington, D. C., attorney of record, for amici curiae The National Housing Partnership and The National Corp. for Housing Partnerships. F. David Lake, Jr., Gary A. Herrmann, and Wilmer, Cutler & Pickering, Washington, D. C., of counsel.

D. Barton Doyle, Washington, D. C., attorney of record for amicus curiae National

Ass'n of Home Builders. Gus Bauman and Nancy H. Liebermann, Washington, D. C., of counsel.

Edward J. Sack, New York City, attorney of record for amicus curiae International Council of Shopping Centers. Stephanie McEvily, New York City, of counsel.

William D. North, Chicago, Ill., attorney of record, for amicus curiae The National Ass'n of Realtors. John R. Linton, Laurene K. Janik and Arthur R. Weiss, Chicago, Ill., of counsel.

Before COWEN, Senior Judge, and DAVIS and NICHOLS, Judges.

## OPINION

PER CURIAM: *

In this suit for refund of 1973 income taxes, plaintiffs seek to deduct Arnold Blitzer's distributive share of the reported losses for that year of a real estate partnership, Terrace Investors, Ltd., in which he was a limited partner, while defendant denies that the partnership actually suffered the losses claimed for that year. The case was tried before Trial Judge Miller.

The partnership constructed, and now owns and operates an 80-unit multifamily housing project for low-income families in McAllen, Texas. The project, known as Ivy Terrace Apartments, was constructed and is operated under Section 236 of the National Housing Act, a program administered by the U. S. Department of Housing and Urban Development (HUD) to encourage private investment in low-income housing. 12 U.S.C. § 1715z–1 (1976).

Under HUD regulations in effect during 1973, a for-profit entity seeking to sponsor a Section 236 project was able to receive federal insurance of private mortgage loans of up to 90 percent of the HUD approved cost of a project for the construction and operation of qualified low-income housing. In addition, a federal subsidy was available to reduce the owner's mortgage payments to the equivalent of a mortgage bearing a 1 percent interest rate. In return, rents, charges, rate of return, and methods of operation were regulated by HUD, and cash distributions of income were restricted to a maximum of 6 percent per annum on the amount of equity invested. *See generally,* 24 C.F.R. § 236 (1971).

With a depreciation base of up to ten times the equity investment and accelerated depreciation and interest deductions, these projects typically generate substantial losses in their earlier years. To enable investors to obtain the tax benefits of such losses, sponsors of these projects ordinarily operate in the form of limited partnerships. The ability to obtain such benefits is a significant factor in attracting private capital, and it is sometimes described as a form of tax shelter.[1]

During 1971, acting through an agent, the initial sponsors of the project purchased an option to buy the land needed, obtained appropriate zoning, water and sewer clearances, and engaged an architectural firm which submitted a site plan. Contemporaneously, they reached an oral agreement with Security Pacific, Inc. (SPI), a Washington corporation, calling for SPI's assistance with HUD processing, and at an appropriate time for SPI to become the administrative general partner in a limited partnership, and to direct the partnership's equity syndication activities and manage the partnership.

---

* This opinion incorporates that of Trial Judge Miller, with some modifications, rearrangements, and deletions by the court after briefing and oral argument. The trial judge's findings of fact are all adopted (but not printed herewith). Any finding contained in this opinion, not included in the formal findings of fact, shall also be considered a finding of the court.

1. The private placement memorandum for the instant partnership, prepared by the organizers as a part of their solicitation to investors to become limited partners, stated:

"It is anticipated that most of the financial advantages, if any, to a prospective investor in the partnership will be in the form of federal income tax benefits resulting from the pass through to each Limited Partner of his share of the partnership's losses, primarily from accelerated depreciation and interest deductions."

On November 7, 1972, HUD issued a conditional commitment to insure a mortgage representing 90 percent of the maximum project costs determined by HUD to be supportable by the economics of the project. Thereafter, the sponsors submitted a loan application to Oak Cliff Bank & Trust Company (OCBT) for a construction loan in that amount.

In March 1973, SPI received checks from eight investors for an initial $140,000. Subsequently, one of the eight withdrew and his interest plus the 50 unsold units were sold to two other investors, including the plaintiff, Arnold Blitzer. SPI deposited such funds in a partnership escrow account in the Bank of California.

On August 24, 1973, HUD issued a firm commitment that it would endorse for insurance a note in the sum of $1,106,500 secured by a mortgage on the proposed Ivy Terrace Apartment project. The note was to bear interest at 7¾ percent and was to be amortized over a 40-year term from the estimated date of completion of the project.

On October 11, 1973, the sponsors executed an original limited partnership agreement for Terrace Investors, Ltd., and filed the certificate with the State of Texas. On October 12, 1973, OCBT agreed to make a construction loan to the partnership; and on the same day the HUD commitment for loan insurance was assigned to OCBT.

On or about October 19, 1973, OCBT paid $11,065 (1 percent of its projected insured loan) to the Government National Mortgage Association (GNMA), a government-owned corporation, for a separate commitment contract, which obligated GNMA to purchase OCBT's loan to the partnership for its face value, $1,106,500, provided that construction was completed and that HUD finally endorsed the note and deed of trust by October 20, 1975.[2]

On October 19, 1973, the Bank of California transferred to OCBT by wire $79,283 in partnership capital contributions which had been on deposit there.

On October 23, 1973, there was an initial closing with respect to the project, in the course of which the following pertinent events took place:

(1) The partnership, as then constituted, executed a building loan agreement with OCBT providing that the partnership was to take a building loan in the sum of $1,106,500 at 7¾ percent interest with a maturity date of January 1, 2015. OCBT was to advance this sum in installments: part pursuant to monthly application therefor and for HUD approval of insurance thereon, to cover 90 percent of the value of work completed and materials and equipment delivered to the building site during the month; and part to cover various specific nonconstruction fees for which HUD also insured advances.

(2) The partnership executed and delivered to OCBT a $1,106,500, 7¾ percent interest, 42 year and 2 month mortgage note in favor of OCBT, secured by a deed of trust, providing for payment of interest alone for the period from November 1, 1973 to January 1, 1975, and for $7,486.80 monthly thereafter for amortization of principal and interest to January 1, 2015.

(3) The partnership and HUD executed a regulatory agreement wherein the partnership agreed to comply with HUD requirements as to the construction and operation of the housing project.

(4) HUD approved for insurance in favor of OCBT the partnership's first request to OCBT for payment of a $104,206.10 advance on the loan, which stated it was needed to pay specified expenses, among which were included the lender's own demands of $22,130 for its "Initial Service Charge" and $11,065 to reimburse it for the "FNMA/GNMA commitment fee" which OCBT had already paid.

2. As an integral part of HUD Special Assistance Program (24 C.F.R. § 320 (1971)) Number 17 (Tandem Plan), GNMA then entered into a contract to sell the loan (together with the right to the GNMA commitment fee) to the Federal National Mortgage Association (FNMA), a publicly owned corporation, at a discount sufficient to give FNMA a return equal to the current market value rate of interest on the open market.

(5) The partnership delivered to OCBT a check drawn on OCBT for $33,210, for both the $22,130 and the $11,065 plus $15 in interest.

(6) The closing taking place after banking hours on October 23, as soon as practicable thereafter on the next day, October 24, OCBT opened a new account in the partnership's name, to which it credited the $79,283 in partnership capital wired October 19 and the $104,206.10 loan advance and charged the $33,210 check.

On December 26, 1973, the limited partnership agreement was amended to substitute the investor limited partners, including plaintiff Arnold Blitzer, for the pre-existing limited partners and to admit SPI as the administrative general partner. The general partners in addition to SPI were two members of the original sponsors designated as developer general partners.

Under the partnership agreement, none of the general partners was to make any contribution of capital. But the limited partners' contributions were to be the source of a number of fees, including an initial fee to the developer general partners and another to the administrative general partner.

Construction of Ivy Terrace Apartments began shortly after October 23, 1973. Five buildings were completed by July 1974 and the remaining five in the following month. Certificates of occupancy were issued by the City of McAllen, Texas, in each of such months.

Final endorsement for insurance of the $1,106,500 note by HUD took place on January 22, 1975, and OCBT sold the note and deed of trust to FNMA.

A number of the issues presented by the petition have been settled by the parties. There remain for decision the deductibility from plaintiffs' 1973 income of plaintiffs' distributive share of the losses attributable to the $22,130 and $11,065 fees claimed to have been paid in that year by the partnership to OCBT and $35,852 paid to SPI as a fee for its services.

THE PARTNERSHIP'S CARRYING ON OF TRADE OR BUSINESS IN 1973.

■ As this case has been presented to the court, the principal issue is whether the partnership, Terrace Investors, Ltd., was engaged in carrying on of a trade or business in 1973. The trial judge held that it was, and we agree.

Section 162(a) of the Internal Revenue Code allows as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." I.R.C. § 162(a) (1976). *Commissioner v. Tellier*, 383 U.S. 687, 689–90, 86 S.Ct. 1118, 1120, 16 L.Ed.2d 185 (1966), states that, "The principal function of the term 'ordinary' in § 162(a) is to clarify the distinction * * * between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset"; while the term "necessary" imposes only "the minimal requirement that the expense be 'appropriate and helpful' for 'the development of the [taxpayer's] business.'" And both *Tellier, supra*, at 689, 86 S.Ct. at 1120, and *United States v. Gilmore*, 372 U.S. 39, 45–46, 49, 83 S.Ct. 623, 627–28, 629, 9 L.Ed.2d 570 (1963), make clear that since the enactment of the 1939 Code predecessor to I.R.C. § 212,[3] the function of "trade or business," in I.R.C. § 162(a) has been merely to render nondeductible "personal" or "family" expenses.

Construed in this light, it is clear that the "trade or business" requirement in I.R.C. § 162(a) is no barrier to any deductions for 1973. For, at all times during that year the partnership was engaged in endeavors serv-

---

**3.** "SEC. 212.   EXPENSES FOR PRODUCTION OF INCOME

"In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

"(1) for the production or collection of income;

"(2) for the management, conservation, or maintenance of property held for the production of income; * * *."   I.R.C. § 212 (1976).

ing "business" or profit-making purposes rather than personal ones. Thus, the partners would qualify for deduction of non-capital expenditures for the production of income pursuant to I.R.C. § 162(a). *See* Treas.Reg. § 1.702–1(a)(8)(i) (1960).

Defendant bases its thesis that the start of a trade or business in the sense of carrying on revenue producing operations[4] is an inflexible temporal prerequisite for the application of I.R.C. § 162(a) principally on four cases: *Richmond Television Corp. v. United States*, 345 F.2d 901 (4th Cir. 1965), *vacated and remanded on other grounds, per curiam*, 382 U.S. 68, 86 S.Ct. 233, 15 L.Ed.2d 143 (1965); *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521 (1979), *aff'd*, 633 F.2d 512 (7th Cir. 1980); *Francis v. Commissioner*, 36 T.C.M. 704 (1977); and *Goodwin v. Commissioner*, 75 T.C. 424 (1980) (*appeal filed*, Dec. 8, 1981 3d Cir.). However, in *Richmond Television* and *Madison Gas & Electric* the particular expenditures at issue were for training of employees and initial establishment of procedures for the operation of new businesses and equipment (television equipment in the former and a nuclear electric generating plant in the latter), which the courts regarded as start-up costs to be treated as capital expenditures under tax law standards even apart from the "trade or business" phrase in I.R.C. § 162. (*Richmond Television* involved the "doubtful prefatory stage" before that taxpayer had even obtained its television license.) Neither case considered the analysis of I.R.C. § 162(a) in *Gilmore* or *Tellier*. And in affirming the capital treatment of the expenses in *Madison Gas & Electric*, the circuit court did not rely on the trade or business phrase. *Francis* and *Goodwin* merely apply the precedent of the other two to real estate construction projects without critical analysis, and again without reference to the analyses of I.R.C. § 162 in *Gilmore* and *Tellier*.[5]

If defendant's construction of I.R.C. § 162(a) were correct, it would deny the deductions to new corporations or partnerships for amortization of organization and loan costs, for payment of telephone and other utility bills, rent, stationery, and salaries and wages of corporate officers, secretaries and even for those who sweep the floor, merely because the business enterprise is not yet in a position to earn income. But this goes too far. I.R.C. § 162 does not require precise matching of income and expenses in the same year. Defendant has supplied no good reason why normal recurring expenses to maintain any business enterprise, and which are not in the nature of start-up costs nor intended to provide benefits extending beyond the year in question, should not be deductible as ordinary expenses of such business irrespective of whether or not the business has yet completed construction or acquisition of its income-producing asset. Expenses of this sort, although incurred prior to the beginning of actual operations of a nursing home, were held deductible in *United States v. Manor Care, Inc.*, 490 F.Supp. 355 (D.Md. 1980). And *see also* Solomon, *Tax Treatment of Pre-Opening Expenses*, 46 Taxes 521 (1968).

In this case, by October 23, 1973, the partnership had acquired the land, had arranged for financing of the project, had executed its building loan agreement and given a note therefor, had received substantial funds, and had prepared plans for actual construction of its apartments (which began shortly thereafter). By any proper criterion for determining whether the partnership was then carrying on its "trade or business," we have to conclude that it was doing so, at least on and after October 23rd. The expenses then and thereafter incurred were not mere start-up or "pre-production" costs; Terrace Investors had actually begun, as a regular, continuous course of conduct, to engage in, and carry on, its "trade or business" of developing, constructing,

---

4. Defendant's thesis is that the partnership did not commence carrying on of its trade or business until 1974 when it first began to seek to rent its apartments.

5. None of the other cases or authorities cited by defendant on this point is truly in point. The issue here is essentially uncontrolled by any prior appellate decisions.

owning and operating an apartment project with a bona fide expectation of profit.[6]

### THE $22,130 INITIAL SERVICE CHARGE **

■ Plaintiffs contend that the $22,130 "Initial Service Charge" was additional interest paid by the partnership to OCBT in 1973 to compensate it for accepting an interest rate which was less than the market rate and that since both the partnership and the plaintiffs used the cash method of accounting for income and deductions the payment was fully deductible from plaintiffs' 1973 income.

Defendant maintains that the $22,130 was not fully deductible from plaintiffs' 1973 income because (1) the charge was not "interest" but a cost to the partnership for obtaining the loan, imposed by OCBT to reimburse it for its services in closing the loan, and hence should be deductible only over the life of the loan; (2) if interest, it was not paid in 1973 but charged to the partnership by reducing or discounting the loan proceeds and was only paid and to be paid as a part of each monthly installment over the 40-year period over which the loan was to be amortized; and (3) if interest and paid in 1973, it was interest prepaid for 42 years, full deduction of which for 1973 would distort both the partnership's and plaintiffs' income for that year and hence should be deductible only pro rata over the life of the loan.

The "Initial Service Charge" was computed by the lender at 2 percent of the principal amount of the note. Although in 1973 HUD imposed a 7¾ percent limit on interest charged by the lender, its regulations permitted the mortgagee to collect from the mortgagor additionally "an initial service charge in an amount *not to exceed* 2 percent of the original principal amount of the mortgage, to reimburse the mortgagee for the cost of closing the transaction." (emphasis supplied.)[7]

The undisputed testimony of the OCBT loan officer who assisted in closing the partnership loan reflects that the lender here used this permission as a device for raising its yield to one more comparable with the market interest rate for such a loan, about 10 percent, the rate it charged conventional residential construction loan borrowers. He stated that the bank would not have been willing to make the loan at a 7¾ percent annual yield alone.

There was no relationship between the cost to OCBT of services to the partnership and the $22,130 charge. The fee varied with the size of the loan irrespective of the extent of the services. At most the cost of the services was only a small fraction of the $22,130. The OCBT loan officer estimated that the man-hour cost of the services connected therewith was probably in excess of $1,000. But he conceded that the bank had never made any study of such costs, and it appeared from his entire testimony that the $1,000 was merely an offhand estimate. Moreover, it did not differentiate between services to the partnership and to the bank. The bank did not ordinarily charge its borrowers separately or additionally for services in connection with making or carrying a loan, and the services performed for the partnership did not differ in kind from those performed in connection with a conventional residential construction loan, although the paperwork may have been somewhat more extensive for the partnership.

A former HUD official, who had served both as an assistant secretary of the department and as Federal Housing Authority commissioner, also testified that it was generally understood both by HUD officials and mortgage insurance applicants that the "Initial Service Charge" was used as a device for raising the yield on regulated interest rate construction loans to market level.

---

6. Our holding that Section 162 applies to taxpayers for the period from and after October 23, 1973, makes it unnecessary to consider the bearing on this case of I.R.C. § 212.

** This portion of the opinion is wholly adopted from that of Trial Judge Miller. Neither side has excepted to this portion of his opinion.

7. HUD Regulations on Multifamily Housing Mortgage Insurance, 24 C.F.R. § 207.2 (1971).

In support of its contention that the 2-percent charge was collected for services and not for interest, defendant relies, first, on the language of the HUD regulation pursuant to which it was authorized, which states that it is allowed "to reimburse the mortgagee for the cost of closing the transaction." Second, defendant points out that in various submissions made by the partnership and by OCBT to HUD to induce HUD to insure the mortgage loan, they both certified that they were familiar with and complied with all pertinent HUD regulations, that the actual interest rate was 7¾ percent and that there were no undisclosed discounts; and in the partnership's request for payment and OCBT's application for insurance of the first advance of $104,206 they certified that it was to be used in part to pay the OCBT "Initial Service Charge" of $22,130, and made no mention of any additional interest. Third, defendant notes that when the revenue agent auditing the partnership inquired of OCBT as to the purpose of the charge, OCBT replied:

> In connection with this loan, we inspected the premises, reviewed and approved the mortgage and other loan documents, and performed the other necessary services related to underwriting, processing, servicing and granting the loan. The 2 per cent initial service charge compensates us for such services. It is collected pursuant to regulations of the Department of Housing and Urban Development which permit a mortgagee to collect such a fee from a mortgagor as an initial service charge in an amount not to exceed 2 per cent of the original principal amount of the mortgage.

It is apparent that there was no correlation between the $22,130 charge and the cost or value of any services performed by OCBT *for the partnership.* On the other hand, it is unreasonable to conclude that when the going market rate was 10 percent a lender would lend money at 7¾ percent without an additional direct or indirect charge for the use of that money. "Interest" has been defined as "compensation for the use or forbearance of money." *Deputy v. DuPont,* 308 U.S. 488, 498, 60 S.Ct. 363,

368, 84 L.Ed. 416 (1940); *see also Old Colony R.R. v. Commissioner,* 284 U.S. 552, 560–61, 52 S.Ct. 211, 213–14, 76 L.Ed. 484 (1932) and *Wilkerson v. Commissioner,* 70 T.C. 240, 253 (1978), *rev'd,* 655 F.2d 980 (9th Cir. 1981). The $22,130, representing an additional 2 percent of principal, was such a charge imposed by the lender for the use of the money, and therefore was clearly interest.

In *Goodwin v. Commissioner,* 75 T.C. 424 (1980) (*appeal filed,* Dec. 8, 1981 3d Cir.), the court found that the evidence as to specific services warranted a finding that a 1 percent "Initial Service Charge" imposed by a lender in connection with a Section 236 project was wholly for services. However, in *Wilkerson,* in connection with two other low-income housing projects, on the basis of evidence as to specific services the court found that in each instance only $7500 out of an approximate $62,500 (2 percent) initial service charge was for services and $55,000 was interest. Suffice it to say as far as the borrower in this case is concerned, the record does not provide any basis for allocation of the "Initial Service Charge", and the entire amount represents what the lender demanded for the use of money.

Defendant's evidence does not disprove that the 2 percent charge was additional interest but only indicates that OCBT and the partnership may have violated HUD regulations and misrepresented the facts in their application for insurance coverage. For this HUD (or defendant) may have a remedy in a suit for breach of contract. But it does not alter the facts with respect to the payment of interest.

I.R.C. § 163 (1976) authorizing deduction of interest paid or accrued, unlike I.R.C. § 162 dealing with trade or business expenses, does not limit deductions to "ordinary and necessary" interest expenses. Thus there is no basis for disallowance on the theory that it is in violation of a federal regulation dealing with a well-established public policy. *See Goldstein v. Commissioner,* 364 F.2d 734, 741 (2d Cir. 1966), *cert. denied,* 385 U.S. 1005, 87 S.Ct. 708, 17

L.Ed.2d 543 (1967); *Wilkerson, supra*, 70 T.C. at 253, *rev'd*, 655 F.2d 980 (9th Cir. 1981); *Sandor v. Commissioner*, 62 T.C. 469, 473 (1974), *aff'd per curiam*, 536 F.2d 874 (9th Cir. 1976).

█ Defendant also urges that in the face of their contrary representations plaintiffs ought to be estopped from claiming that they (or the partnership) paid interest. But to invoke an estoppel against a Code-authorized deduction requires more than misrepresentation. It requires reliance on such misrepresentation by defendant to its detriment and defendant being barred from recoupment or from otherwise being made whole. *Stearns Co. v. United States*, 291 U.S. 54, 54 S.Ct. 325, 78 L.Ed. 647 (1934); *Beltzer v. United States*, 495 F.2d 211, 212 (8th Cir. 1974); *Helvering v. Schine Chain Theatres, Inc.*, 121 F.2d 948, 950 (2d Cir. 1941); and, *cf. Wilmington Trust Co. v. United States*, 221 Ct.Cl. ——, ——, 610 F.2d 703, 714 (1979) (Government unable to recoup time-barred estate tax deficiencies against income tax refund). Here there is no showing by defendant that it could not have sued for damages for breach of contract within the applicable statutory period of limitations after plaintiffs made known their claim for deduction of additional interest paid. And, in any event, defendant had an opportunity to plead and prove such damages pursuant to a claim for breach of contract or other theory as an offset after it became aware of plaintiffs' position in their petition or pretrial submissions. 28 U.S.C. § 2415(f) (1976). But it has not done so.[8]

Next we consider plaintiffs' claim that the partnership prepaid the $22,130 in interest during 1973. Defendant maintains that the partnership did not actually pay such sum but only promised to pay it over the term of the loan while cloaking the transaction in concurrent offsetting credits and debits so as to make it appear that the partnership received a larger advance on its loan and then used part of it to prepay the interest.

Although this issue was decided in favor of the Government in *Parks v. United States*, 434 F.Supp. 206 (N.D.Tex.1977), plaintiffs do not attempt to distinguish that decision but ask us to reexamine the issue as one of general importance to those making similar investments for tax shelter incentives for years prior to 1977.[9] As set forth hereinafter, defendant prevails on this issue.

█ A cash-basis taxpayer qualifies for a deduction only when he pays an obligation for a deductible item in cash or its equivalent. Delivery of a promissory note does not constitute payment for purposes of obtaining an allowable deduction. *Don E. Williams Co. v. Commissioner*, 429 U.S. 569, 97 S.Ct. 850, 51 L.Ed.2d 48 (1977); *Eckert v. Burnet*, 283 U.S. 140, 51 S.Ct. 373, 75 L.Ed. 911 (1931); *Helvering v. Price*, 309 U.S. 409, 60 S.Ct. 673, 84 L.Ed. 836 (1940). As the Court explained in *Don E. Williams Co., supra*, 429 U.S. at 578, 97 S.Ct. at 856, "The reasoning is apparent: the note may never be paid, and if it is not paid, 'the taxpayer has parted with nothing more than his promise to pay.' [Citation omitted.]"

█ More specifically a cash-basis taxpayer who gives a promissory note for interest does not thereby become entitled to a deduction for "interest paid" pursuant to

**8.** Presumably HUD has not requested the assertion of such a breach claim. Moreover, the measure of damages would not necessarily equal the tax claim based on this issue.

**9.** Although I.R.C. § 461(g) (1976) now expressly requires interest prepaid by a cash-basis taxpayer, other than "points" paid in connection with the purchase or improvement of the taxpayer's principal residence, to be allocated to the period with respect to which the interest represents a charge for the use or forbearance of money (as in the case of an accrual-basis taxpayer), this section did not become effective until January 1, 1977. Tax Reform Act of 1976, Pub.L.No.94–455 § 208, 90 Stat. 1520, 1541–42 (1976). The House Report on the measure states, "The committee intends that no inference should be drawn concerning the deductibility of prepaid interest paid before the effective dates of the new rule. It is expected that deductions for such prepayments will be determined according to the criteria of present law." (H.R.Rep.No.94–1380, 94th Cong., 2d Sess. 105, *reprinted in* 1976 U.S.CODE CONG. & AD.NEWS 3356, 3541.)

I.R.C. § 163(a). *Battelstein v. I.R.S.*, 631 F.2d 1182 (5th Cir. 1980) *cert. denied*, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981); *Cleaver v. Commissioner*, 158 F.2d 342 (7th Cir. 1946), *cert. denied*, 330 U.S. 849, 67 S.Ct. 1093, 91 L.Ed. 1293 (1947); *Hart v. Commissioner*, 54 F.2d 848 (1st Cir. 1932); *Quinn v. Commissioner*, 111 F.2d 372 (5th Cir. 1940).

This situation commonly occurs in its simplest form when a loan is made at a discount. The lender credits himself with the interest in advance, and the borrower gives him a note the face amount of which covers both the principal he receives and the interest the lender "withholds." It is well-established that loan discount is the equivalent of paying interest with a note, which does not give rise to a deduction until the note is paid. *Cleaver, supra; United States v. Clardy*, 612 F.2d 1139, 1151 (9th Cir. 1980); *Heyman v. Commissioner*, 70 T.C. 482, 485 (1978), *aff'd*, 633 F.2d 215 (6th Cir. 1980); *Rubnitz v. Commissioner*, 67 T.C. 621, 628 (1977); *Hopkins v. Commissioner*, 15 T.C. 160, 180–81 (1950).

The same principle applies when the parties agree that the lender is entitled to an *additional* fee beyond the stated interest rate and the lender "withholds" part of the loan proceeds for that purpose. This is exemplified by the decision in *Rubnitz*. There a savings and loan association agreed to lend to a developer to construct an apartment complex, $1,650,000 at regular interest rates, plus an additional 3½ percent loan fee, $57,750, payable when the loan proceeds were made available to the borrower. At the closing in 1970 the lender deducted the $57,750 from the loan principal and deposited the remaining $1,592,250 in an account from which the borrower could draw funds for construction. The court sustained the Commissioner's denial of the deduction to the cash-basis developer for 1970 because—

[A] cash basis borrower has not paid interest when the loan transaction is structured so that a loan fee is "withheld" by the lender from what is called the principal amount of the loan and only the supposed principal amount minus the loan fee is actually made available for the borrowing taxpayer's use.

* * * [B]y signing a promissory note, it [the borrower] specifically chose to postpone paying that amount until sometime in the future. The entire $57,780 was to be paid ratably by the borrower over the life of the loan as one component of the monthly installments * * * which would ultimately result in the payment of the full $1,650,000. Therefore, [the borrower] may not deduct the $57,750 as "interest paid" during 1970. *Rubnitz, supra*, at 628.[10]

This is in substance what happened here. OCBT and the partnership entered into a building loan agreement to cover 90 percent of the cost of an apartment project. OCBT deemed the 7¾ percent per annum regulated rate of interest on the loan to be unattractive without an additional 3 percent: $22,130 (2 percent) to be retained for itself beneficially, and $11,065 (1 percent) to reimburse it for minimizing its risks by obtaining a purchase commitment from FNMA after completion of construction. As prearranged, at the closing the partnership applied for a $104,206 advance, of which $33,210 was discounted to cover the lender's additional charges and only the remaining $70,996 was made available to the borrower. At no point in time did OCBT relinquish possession or control of the additional $33,210, nor did the partnership obtain it.

While the partnership remains obligated to pay the $33,210 over the 42-year term of the mortgage note, it no more paid the $22,130 in additional interest included therein in 1973 than it paid the 7¾ percent stated interest for the 42-year term in that year.

---

**10.** *See also Cleaver v. Commissioner*, 158 F.2d 342 (7th Cir. 1946), *cert. denied*, 330 U.S. 849, 67 S.Ct. 1093, 91 L.Ed. 1293 (1947); *Keith v. Commissioner*, 139 F.2d 596 (2d Cir. 1944); *Ferris v. Commissioner*, 38 B.T.A. 312 (1938),

*aff'd per curiam*, 102 F.2d 985 (2d Cir. 1939); *Parks v. United States*, 434 F.Supp. 206 (N.D. Tex.1977); *Heyman v. Commissioner*, 70 T.C. 482 (1978), *aff'd*, 633 F.2d 215 (6th Cir. 1980); *Watson v. Commissioner*, 8 T.C. 569 (1947).

Plaintiffs attach significance to the fact that at the closing the partnership gave OCBT a check for the $33,210. But the check was written on the same OCBT account to which OCBT concurrently credited the face amount of the advance. Since there is no indication in the record that OCBT would have made the entire $104,206 available to the partnership without the simultaneous $33,210 offset, the check was a mere redundancy in what was in substance a loan at a discount.

In *Rubnitz, supra,* 67 T.C. 621, the taxpayers contended that the substance of the "withholding" there was no different than if the lender had deposited the full face value of the note in the borrower's account and the latter had then withdrawn the funds to pay the loan fee. The court responded that, even if the loan transaction had been so structured, the critical point which would have remained was that the borrower never had unrestricted control over any portion of the loan proceeds, and therefore (at 629):

> a prearranged retransfer of funds, immediately after they had been deposited in [the borrower's] account, as the final step in an integrated transaction would not constitute the "payment" which gives rise to a deduction by a cash basis taxpayer. *Thomas Watson,* 8 T.C. 569, 579; *T. Harvey Ferris,* 38 B.T.A. 312, 317, affirmed per curiam, 102 F.2d 985 (2d Cir.).[11]

In *Battelstein, supra,*[12] 631 F.2d 1182, a savings association had lent to the real estate developer plaintiffs $3 million to purchase property and also had agreed to make to them, if desired, future advances of the interest costs on the loan as they became due. Each quarter the lender would notify the Battelsteins of the amount of interest currently due. The Battelsteins would then send the lender a check in such amount, and, on its receipt, the lender would send the Battelsteins its check in the identical amount.

Quoting the frequently reiterated tax law aphorism that "[a] given result at the end of a straight path is not made a different result because reached by following a devious path," [13] the court ruled that the exchanges of checks were inconsequential and should be ignored, that looking through the form of the transaction the substance was that the Battelsteins had not extinguished their interest obligations to the lender by giving notes promising future payment, and that for tax purposes such notes did not constitute payment entitling a taxpayer to a deduction.

■ Under the *Battelstein* rationale a debtor is not recognized as having paid interest on a loan if he borrowed an equivalent sum from the creditor in a transaction closely linked to the payment of the interest, irrespective of the sequence. And it does not matter whether or not the borrower initially had funds of his own upon which he drew for the payment, nor whether or not he was given unrestricted control of the funds he received.

The *Battelstein* rationale is in accord with Supreme Court decisions holding that in particular circumstances prearranged reciprocal transactions must be combined to determine their effect under the tax law. In *Knetsch v. United States,* 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960), a taxpayer purchased deferred annuities from an insurance company giving nonrecourse notes for most of the purchase price and paying in advance the first year's interest of $140,000 on the notes. Five days later

---

11. *Watson* involved a claim for a bad debt loss by a guarantor of a defaulted corporate note who, pursuant to pre-arrangement, borrowed an equivalent sum from the same lender on his personal note, deposited the proceeds in his personal checking account with the same lender commingled with his own funds, and then paid off the defaulted corporate note with those funds. The court denied him a bad debt deduction because despite his "payment" of the defaulted corporate note, in substance he had merely substituted his personal note therefor. *Ferris* was substantially identical.

12. Decided *en banc* by a majority of 14 judges out of 24.

13. 631 F.2d at 1184, *quoting, Minnesota Tea Co. v. Helvering,* 302 U.S. 609, 613, 58 S.Ct. 393, 394, 82 L.Ed. 474 (1938).

the insurance company lent the taxpayer $99,000 against the excess of the cash value of the annuities over the amount of his indebtedness and the taxpayer prepaid $3,465 in first-year interest on that loan. The loans and interest were repeated in subsequent years. The Supreme Court denied the taxpayer deductions for interest on indebtedness, describing the loans as in reality only rebates of the so-called interest. In *United States v. Estate of Grace*, 395 U.S. 316, 89 S.Ct. 1730, 23 L.Ed.2d 332 (1969), a decedent's estate claimed that his inter-vivos transfer of property to his wife for life with remainders in fee to their children was a completed gift not subject to estate tax on his death. But the Court held that to the extent that in a separate but related transaction his wife had transferred property of equivalent value to him for life with similar remainders the economic effect was the same as a transfer of property by each with a retained life estate, and hence it was includable in the estate of each. And *see also Goodstein v. Commissioner*, 267 F.2d 127, 131 (1st Cir. 1959); *Burck v. Commissioner*, 533 F.2d 768, 770 n.3 (2d Cir. 1976) (Oakes, J., speaking for himself only); *Krause v. Commissioner*, 57 T.C. 890 (1972), aff'd, 497 F.2d 1109 (6th Cir. 1974), *cert. denied*, 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975).

Under the rule applied in *Battelstein* the partnership's issuance of its check for the additional interest may not be deemed a payment thereof because the payee simultaneously advanced an equivalent sum to the payor for the same purpose.

Plaintiffs contend that *Battelstein* was wrongly decided and urge that this court follow instead the more liberal view of several Tax Court decisions which hold that if the borrower is given unrestricted control and ownership of funds advanced by the lender for the payment of interest and the borrower then uses such funds for that purpose, he may obtain a deduction for the interest so paid. In such cases the commingling of the borrowed funds with the borrower's own funds in an unrelated bank account has been deemed evidence of such unrestricted ownership and control. *Wilkerson v. Commissioner*, 70 T.C. 240 (1978), rev'd, 655 F.2d 980 (9th Cir. 1981); *Burck v. Commissioner*, 63 T.C. 556 (1975), *aff'd on other grounds*, 533 F.2d 768 (2d Cir. 1976); *Burgess v. Commissioner*, 8 T.C. 47 (1947).

Plaintiffs argued that the deduction they seek fits within the rule of the cited Tax Court cases because the partnership's check for the $33,210 was drawn on an account in which its own funds were commingled with the borrowed funds. But none of such cases supports the plaintiffs on the facts herein. In *Wilkerson* the court allowed the taxpayers deductions for interest paid on a note with funds borrowed from the lender because the lender relinquished all control and the borrowers obtained unrestricted control over such funds. This was demonstrated to the court's satisfaction by the fact that prior to the payment of the interest the borrowers deposited the funds in an account with a *different* financial institution commingled with funds originating with themselves, from which they alone could make withdrawals and to which the lender was not even a signatory. The court took pains to emphasize the factual differences between that case and *Rubnitz, Watson* and *Ferris* wherein (at 258)—

> the taxpayers maintained their bank accounts at the same banks from which the loans were obtained. The banks merely credited the loan proceeds to the taxpayers' accounts and immediately charged the accounts for the amounts at issue. Therefore, even though the loan proceeds were first credited to the accounts, the lenders retained control over the proceeds by virtue of the accounts being maintained with the lenders. 70 T.C. at 258, rev'd, 655 F.2d 980 (9th Cir. 1981).

And the same reasoning is the basis for the decisions in *Burgess* and *Burck, supra*.

That the lender's relinquishment of control over specific funds and the concomitant vesting of unrestricted control of such funds in the borrower remain a prerequisite to the recognition of the borrower's use of such funds as a payment of interest is still

the Tax Court rule is apparent from a later decision, *Heyman v. Commissioner*, 70 T.C. 482 (1978), *aff'd*, 633 F.2d 215 (6th Cir. 1980), prepared by the same judge as in *Wilkerson*. There the court held that a borrower did not pay interest during the year when the construction lender charged such interest to him by debiting the borrower's loan account and thereby reduced the amount available to the borrower on the principal loan.

Plaintiffs' argument that the partnership commingled the $33,210 with its own funds is based on the misconception that OCBT actually relinquished or gave to the partnership ownership or unrestricted control over the money which was "withheld." The record here, as in *Rubnitz*, does not reflect that the $33,210 was an actual asset of the partnership which could be commingled with other assets. It was nothing more than the total of OCBT's two claims for additional compensation which it treated as having been constructively advanced to the partnership and was to be paid as the face amount of the note was paid.

If by the commingling argument plaintiffs wish the court to infer that the partnership may have paid the $33,210 out of its own funds, the burden of proof in that regard, as in the case of any other taxpayer seeking a refund attributable to a deduction from income, was on the plaintiffs. *Missouri Pacific R.R. v. United States*, 168 Ct.Cl. 86, 90, 338 F.2d 668, 671 (1964). They failed to carry that burden. Indeed, the only evidence in the record is to the contrary. The partnership's request to OCBT for the loan advance and OCBT's application to HUD for insurance of the advance of mortgage proceeds certified that the $104,206 was required to cover enumerated obligations, among which the "Initial Service Charge" of $22,130 and the FNMA/GNMA commitment fee of $11,065 were specifically set out. And in the application OCBT further certified to HUD that—

after the payment herein first mentioned is made, a total sum of *$104,206.10* will have been disbursed from mortgage proceeds, and that the "total sum of *$–0–* will have been disbursed from the mortgagor's cash escrow required, if any, over mortgage proceeds to complete the project.

The Building Loan Agreement executed by the partnership and OCBT also provided, "The Borrower covenants that it will hold in trust each advance hereunder for application to the items for which such advance was requested and approved."

It may be that it would have been feasible for the partnership to have prepaid OCBT's additional interest charge with its own funds rather than to use them for construction of the project, which is not deductible except by way of depreciation over the life of the project. But, as the Tax Court stated in *Heyman, supra*, 70 T.C. at 487, "We must decide this case, however, on its facts and the lack of actual payment remains a fact regardless of any assertions as to how things might have been done otherwise." And, as the Supreme Court reiterated in another context in *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974)—

> This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not . . . and may not enjoy the benefit of some other route he might have chosen to follow but did not.

Thus, for purposes of the present case it is unnecessary to decide whether the Fifth Circuit or the Tax Court more accurately states the law with respect to the prepayment of interest by a debtor with funds originating with the creditor, since under neither rule are the plaintiffs entitled to recover.[14]

---

14. Defendant also argues that even if paid the $22,130 should not be deductible for 1973 because: (1) such prepaid interest is an asset having a useful life equivalent to the term of the loan and should therefore be amortized over 42 years; and (2) the allowance of the

### THE $11,065 FNMA/GNMA COMMITMENT FEE

■ This issue deals with the remainder of the $33,210 which OCBT credited to itself at the closing and withheld from the amount advanced to the partnership.

Plaintiffs argue that the $11,065, representing 1 percent of the loan, was a sum paid by the partnership to FNMA for a commitment to make a permanent mortgage loan to the partnership at the completion of the project; and that since it was paid to have FNMA stand by for a period prior to its loan it was not an interest charge. Therefore, plaintiffs urge, it was deductible for 1973 either as a business expense pursuant to I.R.C. § 162(a) or as an expense paid for the production of income pursuant to I.R.C. § 212.

Defendant argues that such expenditure was not deductible for 1973 because (1) it was not actually paid by the partnership in that year but like the initial service charge *(supra)* was withheld by the lender, OCBT, and will only be paid by the partnership over the term of the loan; (2) if the fee was paid, it was a cost of obtaining the mortgage loan which must be capitalized and amortized over its term; and (3) if the fee was paid and represented additional interest, it was prepaid interest which likewise be amortized over the term of the loan in order to clearly reflect income.

Central to plaintiffs' argument is the thesis that OCBT was a mere conduit for the payment of the commitment fee by the partnership to FNMA. Plaintiffs' reasoning is as follows: During 1973 the maximum stated interest on FHA-insured loans was 7¾ percent, but the market interest rate for permanent multifamily residential loans was considerably higher. Accordingly, if the partnership wanted to construct a low-rent apartment project under the Section 236 program it would have to plan on obtaining its permanent mortgage loan from FNMA which would receive a federal subsidy from GNMA for the difference. But, explain the plaintiffs—

deduction would result in the distortion of income and would be inconsistent with the clear reflection of income. In view of the result

Under this subsidy program, the commitment for a permanent loan was issued to the construction lender and not to the borrower, because HUD did not permit FNMA or GNMA to contract directly with mortgagors. A borrower could obtain a Section 236 permanent loan from FNMA only if the borrower arranged the transaction through a HUD-approved construction lender.

Therefore, plaintiffs conclude, "In obtaining a FNMA permanent loan commitment, a construction lender, such as OCBT, was acting solely on behalf of the borrower."

However, plaintiffs' conclusion is in error, because OCBT was more than a mere conduit for payment of the commitment fee; it was also acting on its own behalf in acquiring the commitment. Presumably OCBT hoped to profit from advancing the money for construction at 7¾ percent per annum plus the 2 percent "Initial Service Charge" *(supra)*, or else it would not have made the loan. In addition, since the note it received in exchange for the loan had a 42-year term, it had an opportunity for further profit if market interest rates for such notes fell, because then it could exercise its option to retain the note or sell it at a premium. On the other hand, such opportunities for profit also exposed it to the possibility of loss in the event available market interest rates rose over the construction period, in which event it could only have sold the note at a discount. The acquisition of a 2-year commitment from FNMA to purchase the note at face value for a premium of 1 percent of such value served to protect OCBT against the possibility of such loss. That OCBT increased its charges to the borrower by an equivalent amount to cover the cost of the commitment did not make OCBT a mere conduit any more than any other lender or seller becomes a mere conduit by passing on one of his cost items to a customer.

herein, it is unnecessary to consider these issues.

The fact that it served the borrower's as well as the lender's interest for the lender to incur such an additional cost has no bearing on the nature of the payment from borrower to lender. To the partnership the 1 percent was an additional cost of the 42-year loan.

Plaintiffs assert that financial institutions making construction loans do not make permanent loans and that this is particularly true with respect to a commercial bank such as OCBT. Furthermore, they say, OCBT could not reasonably have considered the possibility of selling the partnership note to anyone other than FNMA because the 7¾ percent stated interest rate was below the market rate for long-term loans. Therefore, plaintiffs argue, OCBT had no interest in protecting the permanent loan against reduction in market value, and the FNMA commitment fee did not serve OCBT's interest but only that of the partnership.

This argument is defective in several respects. First, the FNMA commitment was an essential protection to OCBT even if its primary intention was to assume the loan only for the construction period. Since obviously the borrower would not have the funds to repay OCBT upon completion of construction, OCBT had to sell the note to a third person to obtain repayment. Only by obtaining the commitment from FNMA could it have assurance that its selling price would be at face value. Second, construction lenders do in fact assume permanent loans when they become profitable. In *Lay v. Commissioner*, 69 T.C. 421 (1977), involving two Section 236 projects similar to the one herein, the construction loan lenders, one an insurance company and the other a commercial bank, both paid the FNMA commitment fee, but on completion of construction elected to retain the permanent loans rather than to sell them to FNMA at face value. Third, even if the 7¾ percent was less than the going rate for long-term loans in 1973, plaintiffs have not established

that the probability that the going rate would be reduced to less than 7¾ percent by the time of completion of construction was so remote that OCBT would have wholly excluded the possibility of profit on resale of the note at a premium to others in or after 1975. Therefore, it cannot be said that in paying 1 percent of the face value of the loan for a commitment by FNMA/OCBT served no purpose of its own but was merely a conduit for the partnership.

Plaintiffs make much of the fact that this fee had to be paid through OCBT because the government agencies would not deal with the partnership itself. It seems to be thought that this was a formal, technical requirement, without any true purpose, which should be disregarded for tax purposes. But we cannot accept the Government's format as without legal and practical significance. Obviously the Government wanted to deal only with approved and qualified lenders and mortgagees, and our cases have also indicated that the Government wanted to limit the parties with whom it was in privity, and to separate itself from private borrowers such as Terrace Investors, Ltd. *See, e.g., Aetna Casualty and Surety Co. v. United States*, 228 Ct.Cl. ——, 655 F.2d 1047 (1981), and the cases cited. Contrary to plaintiffs, the format chosen by the Government did have significant components of substance.

Having determined that the $11,065 charge by OCBT to the partnership account was a loan fee, for the reasons already discussed with respect to the $22,130 *(supra)* it is concluded that this sum was not paid during 1973 but was discounted from the amount stated to have been borrowed and it will only be paid as the note is amortized over the remaining 40 years beginning with completion of construction.[15]

Plaintiffs insist that, for the purpose of further proceedings in this case, we decide expressly whether or not the FNMA/GNMA fee is to be amortized over

---

**15.** In view of the result reached herein, it is unnecessary to consider defendant's alternative argument that if paid the commitment fee was

a capital expenditure to obtain the loan and hence was not fully deductible in 1973, but only amortizable ratably over the term of the loan.

the period of the so-called "construction" loan or over the period of the whole loan ("construction" loan plus "permanent" loan). The trial judge ruled for the latter, and we concur. It is true that (a) the documents (on the government forms mandated by the federal agencies) contained a few sporadic references to "the construction loan" and "permanent loan", and (b) the general custom and practice of the real estate industry is to have two separate loans, construction and permanent. But here there was only a single note, not divided into construction and permanent phases, with a set of detailed provisions for payment until 2015 (a period obviously including both phases). There was no separate treatment of a "construction loan," and such a "loan" was not required to be paid at the end of construction. The partnership obtained one loan for about 42 years, and the only difference to it was in the entity to which it was to make payments, first to OCBT (for a short period) and then to FNMA. Legally, in the very unlikely event that FNMA or GNMA had not accepted assignment of the loan, the partnership would not be required to repay the "construction loan" to OCBT. We cannot say that the legal arrangement, demanded by the Government, was inadvertent or without any effect or substance. And for tax purposes those legal rights and obligations must prevail over general private practice or the usual accounting rules for private real estate transactions.

### THE $35,852 ADMINISTRATIVE MANAGEMENT FEE PAID TO SECURITY PACIFIC, INC. IN 1973

Between October 23 and December 31, 1973, the partnership paid to Security Pacific, Inc. (SPI), the administrative general partner, a $35,852 fee. In their 1973 income tax return plaintiffs deducted their proportionate share of such sum as a business expense, but the Commissioner disallowed it.

SPI was selected as administrative general partner because of its expertise in all aspects of real estate development, construction, ownership, operation and management, including housing insured and subsidized under the Section 236 program.

Roger Rieger, an officer of SPI, summarized its role as administrative general partner as that of looking out for the interests of the limited partners and doing everything it can do to see that the partnership is managed properly and effectively, remains viable and does not default on its debt.

At the inception of such a partnership SPI does not know what it will be called upon to do, although there are certain things which it does in every instance. First, it makes an initial feasibility study. This includes a site inspection, a market study, and an analysis of the financial situation of the sponsors and of the contractor selected by the sponsor, including the adequacy of his bond. Next, it prepares the various partnership and securities documents necessary for sale of limited partnership interests and directs their syndication. Then, it arranges for the certified public accountants to handle the yearly audits and the tax returns so as to insure that the partnership information returns are prepared properly and mailed to the limited partners in adequate time to reflect the results in their own tax returns. Thereafter, it involves itself in the selection of the management company and the development of management and marketing plans.

While SPI does not ordinarily deal with HUD directly, because of its expertise it advises and directs partnerships on problems involved in HUD processing of applications and obtaining expedited approval thereof.

During the construction period SPI monitors the construction on the basis of review of the reports of HUD, the inspecting architect and the developer general partners and one or two site inspections of its own, so as to avoid cost overruns and to enable it to report to the limited partners monthly on the progress and timeliness of such construction.

As the apartment units near readiness for occupancy, SPI supplies its own management and marketing experts to advise and

consult with the developers and management company as to the best methods of getting the units rented quickly, including such things as the nature of the advertising and the display of the model apartments.

At all stages during the entire life of a partnership, SPI, as administrative general partner, supervises and reports to the limited partners with respect to operations, finances, management and other matters affecting their interests. It receives and distributes funds (when and if there is a cash flow). And it reviews and approves partnership tax returns and computations of the deductions allocable to each of the limited partners.

The sponsors first retained SPI in 1971 under an oral agreement calling for SPI assistance with HUD processing. On December 13, 1972, the sponsors entered into a written agreement calling for SPI to become a general partner and giving it the responsibility for marketing the limited partnership interests. The amended limited partnership agreement formally designating SPI as the administrative general partner was executed on December 26, 1973.

The limited partnership agreement described SPI's duties in the most general terms. SPI was to receive an administrative management fee of $36,347, "for, but not limited to managing the partnership, structuring the project to provide maximum benefits to the Limited Partners and monitoring the project for the Limited Partners", payable from the limited partners' contributions as they were received: $35,852 from the first contribution and $495 from the second.

In addition, SPI was entitled to receive a "continuing management fee" equal to 20 percent of the cash flow allowable for distribution to the parties under the HUD agreement, if available, which meant a maximum of $1,242 in any year. Moreover, SPI was contingently entitled to 16 percent of any surplus cash gains available upon sale of the project (which was not allowable short of 20 years without HUD approval).[16]

During 1973, SPI selected and contracted with a broker-dealer to raise the equity capital by selling 190 units of limited partnership interests at $1,000 per unit with a minimum of 19 units per investor. It prepared the partnership and securities documents necessary for the broker-dealer to engage in such activities. It received the equity capital from the broker-dealer and deposited it in a bank account.

Because of a moratorium on HUD approval of such projects initial closing was delayed from early 1973 until October of that year. During this period SPI took an active part in the processing of the HUD application and reported monthly to the investors on the status of the project. Because of the delay the original contractor was unwilling to build the project for the original contract price, and it became necessary for SPI to locate and direct the local developer partners to a new contractor.

When SPI first became involved it found it necessary to change the management company originally selected by the partnership. After a year and a half it found the performance of the second management unsatisfactory and it replaced it with still another management company. Because of rapidly increasing utility rates, during 1975 the partnership operated at a deficit and was short of cash to meet its obligations. SPI initiated several steps to keep it solvent: It advanced $5,000 to enable the partnership to make a deposit required by the utility company and $20,000 as collateral for a bank loan to enable the partnership to

---

**16.** Roger Rieger, an officer of SPI, testified that there is generally no cash flow from projects of this kind for 4 or 5 years after completion of construction. In this particular instance the project encountered financial difficulties and there has been no cash flow up to the date of trial.

The partnership also paid SPI a separate sum in the amount of $2,500 to reimburse it for the expenses involved in the public offering of the partnership interests. These included the legal, accounting and printing expenses of the offering. Automatic word-processing machines produced the documents from forms used in prior syndications, and employees of SPI filled in the blanks.

pay other bills. It took the partnership's insurance away from a company favored by the local developer partners and placed it with another company with which SPI could command more favorable rates. And it applied to HUD and obtained expedited approval for rent increases.

No portion of the project was ready for occupancy until July 1974, and prior to the close of 1973 the partnership engaged in no rental or management activities.

Plaintiffs maintain that the entire $35,-852 paid to SPI in 1973 was a business expense of the partnership deductible in that year. Defendant contends that because neither the partnership nor SPI knew what services SPI would ultimately be called upon to perform, the $35,852, characterized by Mr. Rieger as a "front-end" administrative management fee, could not be an allocation for the value of services performed up to that time, but instead was a prepayment for services to be performed as a general partner during the life of the partnership. Since I.R.C. § 162(a)(1) limits deductions for expenses for services only to those services which have been "actually rendered," [17] defendant argues, the partnership was not entitled to deduct the $35,852 fee for 1973. At most, defendant says, the partnership was entitled to amortize the fee as a prepaid asset over its 50-year life, but it was not entitled to deduct any amortizable segment for 1973, because I.R.C. § 162(a)(1) limits expense deductions to those which are "ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business," and during 1973 the partnership was not yet carrying on any trade or business.

In their reply plaintiffs do not dispute that the $35,852 represented a prepayment. They contend that the entire fee is nonetheless deductible for 1973 because it was paid in that year by a cash-basis partnership and because by the payment the partnership did not acquire a recognizable capital asset which could be amortized. Alternatively, plaintiffs argue the fee should be amortized over the first 5 years from receipt because most of the services were performed during the early years of the project when the major problems had to be overcome; and SPI expected that after the first 5 years the partnership would earn enough to enable cash flows sufficient to pay $1,242 per year to SPI, which would compensate it for its management services from that point on. Plaintiffs also urge that if amortization is required the partnership was entitled to deduct an amortizable share in 1973 because its trade or business began with the initial closing in 1973.

The record discloses that the $35,852 was used to pay for four kinds of services for which the Internal Revenue Code requires different kinds of treatment. The first two of these are:

(1) Services in connection with the organization of the partnership and obtaining capital by syndication of its shares of limited partnership interests.

(2) Services in connection with the acquisition and construction of the partnership's capital assets.

An expenditure which might otherwise be deductible under I.R.C. § 162(a) becomes nondeductible if it is capital in nature. The pertinent Code provisions are I.R.C. §§ 161, 261 and 263 (1976). I.R.C. § 161 provides that in computing taxable income there shall be allowed as deductions the items specified in part VI "subject to the exceptions provided in part IX (sec. 261 and following, relating to items not deductible)." (Part VI deals with business expenses, interest, taxes, losses, bad debts, depreciation, etc.) I.R.C. § 261 in turn prescribes that in computing taxable income "no deduction shall in any case be allowed in respect of the items specified in this

---

17. I.R.C. § 162(1976) provides:

(a) In General.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered.

part." And I.R.C. § 263(a) states as one such item the general rule that no deduction shall be allowed for capital expenditures.

These I.R.C. §§ 161 and 261 constitute a "priority-ordering directive" which "requires that the capitalization provision of § 263(a) take precedence" over a section allowing a deduction, and—

> The clear import of § 161 is that, with stated exceptions * * *, an expenditure incurred in acquiring capital assets must be capitalized even when the expenditure otherwise might be deemed deductible under Part VI, *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 17, 94 S.Ct. 2757, 2767, 41 L.Ed.2d 535 (1974).

And see also *Southland Royalty Co. v. United States*, 217 Ct.Cl. 431, 434–35, 582 F.2d 604, 606 (1978), *cert. denied*, 441 U.S. 905, 99 S.Ct. 1991, 60 L.Ed.2d 373 (1979).

■ Expenses in connection with the organization of corporations, the issuance of stock and the acquisition of corporate assets have long been treated as non-deductible capital expenditures. *See 4A J. Mertens, Jr., Law of Federal Income Taxation* § 25.35 (rev. ed. 1979). And similar expenses in connection with the establishment of limited partnerships and acquisition of their assets have been given like treatment. *Cagle v. Commissioner*, 539 F.2d 409, 415 (5th Cir. 1976); *Kimmelman v. Commissioner*, 72 T.C. 294, 304–06 (1979); *Meldrum & Fewsmith, Inc. v. Commissioner*, 20 T.C. 790, 807 (1953), *aff'd on other grounds*, 230 F.2d 283 (6th Cir. 1956); and *4A J. Mertens, Jr., supra.*

■ Capital expenditures are not limited to the actual acquisition cost of assets but include legal, brokerage, accounting,

appraisal and other ancillary expenses incurred in acquiring or disposing of a capital asset. *Woodward v. Commissioner*, 397 U.S. 572, 576–77, 90 S.Ct. 1302, 1305–06, 25 L.Ed.2d 577 (1970). They may include compensation for services in connection with the construction or acquisition of a capital asset. *Idaho Power, supra*, 418 U.S. at 13, 94 S.Ct. at 2765; *Cagle, supra*, 539 F.2d at 416; *Briarcliff Candy Corp. v. Commissioner*, 475 F.2d 775, 781 (2d Cir. 1973); *Perlmutter v. Commissioner*, 44 T.C. 382, 404 (1965), *aff'd*, 373 F.2d 45 (10th Cir. 1967). And they may include an amortized portion of the cost of another asset consumed in connection with the construction. *Idaho Power, supra.*

■ In determining whether an expenditure having dual purposes, capital and expense, is deductible, we may not look to its predominant purpose, but must allocate the portion applicable to each. *Woodward, supra*, 397 U.S. at 577, 90 S.Ct. at 1306; *Idaho Power, supra; Southern Natural Gas Co. v. United States*, 188 Ct.Cl. 302, 372–80, 412 F.2d 1222, 1264–69 (1969); *Great Northern Ry. v. Commissioner*, 40 F.2d 372 (8th Cir. 1930), *cert. denied*, 282 U.S. 855, 51 S.Ct. 31, 75 L.Ed. 757 (1930).[18]

■ From the evidence in the record it appears that most of the services performed by SPI in 1973 gave rise to capital expenditures. To the extent that the 1973 SPI fee payment is allocable to services ancillary to the organization of the limited partnership and syndication of its shares, it is a capital expenditure to be amortized over the (50 year) life of the partnership beginning in 1973. *Cagle, supra*, 539 F.2d at 415; *Kimmelman, supra*, 72 T.C. at 304–06. To the extent that the services are ancillary to the

---

**18.** In *Idaho Power*, the Supreme Court required that a public utility company capitalize that portion of depreciation on transportation equipment allocable to part-time use in constructing improvements and other capital facilities for the company. In *Southern Natural Gas*, this court held that depreciation on automotive equipment used primarily for operating and maintaining a pipeline system, but occasionally used in construction operations had to be allocated between uses, and, the costs allo-

cable to construction had to be capitalized. In *Great Northern Ry.*, the court denied the railway a deduction for the full cost of operating its regular passenger and freight trains because it transported its workmen and materials to construction sites on such regular trains. The court required that the railway estimate the amount attributable to the cost of transporting men and materials and allocate this sum to its capital account.

acquisition or construction of the apartment units the expenditure is likewise capital, amortizable over the life of such assets. This would clearly include such services as the making of the feasibility study, the hiring of the contractor and the monitoring of the construction. *Cagle, supra*, 539 F.2d at 416. However, since the apartment units were not ready for occupancy until mid-1974, no deduction is allowable for amortization of any part of their cost during 1973. Long standing Treasury Regulations, in effect for 25 years, provide that depreciation or amortization of the cost of capital assets does not begin until they are placed in service. Treas.Reg. § 1.167(a)–10(b), added by T.D. 6182, 35 C.B. 98 (1956). And *see also Idaho Power, supra.*

The third kind of services performed by SPI was in connection with obtaining HUD approval of the 42-year loan and insurance thereof. Compensation for this is likewise a capital expenditure, the benefits of which must be amortized over its 42-year life beginning with the making of the loan in 1973. *Cagle, supra*, 539 F.2d at 416. *Goodwin v. Commissioner*, 75 T.C. 424 (1980) (*appeal filed*, Dec. 8, 1981 3d Cir.); *Wilkerson v. Commissioner*, 70 T.C. 240, 261 (1978), *rev'd*, 655 F.2d 980 (9th Cir. 1981).

The fourth kind of services is that of a non-capital nature. To the extent the $35,852 was not otherwise a capital expenditure, it was, as Mr. Rieger characterized it, a "front-end fee" for services to be rendered throughout the life of the partnership. This is confirmed by the terms of the partnership agreement itself (quoted *supra*). The difficulty with allowing any deduction for these is that plaintiffs have not presented any evidentiary basis for their allocation. With respect to the services not ancillary to capital acquisition the record does not establish which were attributable to 1973 alone. Thus deduction of the entire sum for 1973 also necessarily runs afoul of the requirement in I.R.C. § 162(a)(1) that it must be for ordinary services "actually rendered"; and plaintiffs do not present any argument to overcome it.

In addition, it has also been well-established in the tax law for many years that prepayment of expenses generally results in the creation of an intangible asset—here prepaid services—which must be capitalized and amortized over the years of its exhaustion. See, *e.g., Commissioner v. Boylston Market Ass'n*, 131 F.2d 966 (1st Cir. 1942); *Peters v. Commissioner*, 4 T.C. 1236 (1945); *Cohen v. Commissioner*, 10 T.C.M. 29 (1951) (prepaid insurance premiums); *Galatoire Bros. v. Lines*, 23 F.2d 676 (5th Cir. 1928); *Cartan v. Commissioner*, 30 T.C. 308 (1958) (required payments in first year of lease attributable to rent in subsequent years); *Main & McKinney Bldg. Co. v. Commissioner*, 113 F.2d 81 (5th Cir. 1940), *cert. denied*, 311 U.S. 688, 61 S.Ct. 66, 85 L.Ed. 444 (1940); *Baton Coal Co. v. Commissioner*, 51 F.2d 469 (3rd Cir. 1931), *cert. denied*, 284 U.S. 674, 52 S.Ct. 129, 76 L.Ed. 570 (1931); *University Properties, Inc. v. Commissioner*, 45 T.C. 416 (1966), *aff'd*, 378 F.2d 83 (9th Cir. 1967) (advanced rental premiums or payments made as consideration for a lease); *Lovejoy v. Commissioner*, 18 B.T.A. 1179 (1930) (loan costs such as commissions, fees, and printing expenses). Payments for future services were specifically held to be capital expenditures, which must be amortized, in *Bassett v. Commissioner*, 26 T.C. 619 (1956); *Farming Corp. v. Commissioner*, 11 B.T.A. 1413 (1928); *Syracuse Washing Machine Corp. v. Commissioner*, 17 B.T.A. 11 (1929); and *Maple v. Commissioner*, 27 T.C.M. 944 (1968), *aff'd*, 440 F.2d 1055 (9th Cir. 1971).

Having determined, contrary to plaintiffs' position, that the partnership was not entitled to deduct the entire $35,852 for 1973, we now turn to defendant's contention that the partnership was not entitled to deduct any part thereof for that year, including the amortization of capital items, because the partnership was not carrying on any "trade or business" prior to the completion of the apartment project in mid-1974. In response to this contention plaintiffs maintain that the partnership was carrying on a "trade or business" from the "initial closing" on October 23, 1973, when the partnership, the lender and HUD com-

mitted themselves to going forward with the project.

We have already determined, *supra,* that plaintiffs are correct—that the partnership was carrying on a "trade or business" at least from and after October 23, 1973. Since SPI performed the administrative functions of the limited partnership and there were no other partnership employees, plaintiffs might well be able to prove that some portion of SPI's compensation was of a non-capital nature, for performing overhead, record keeping and normal housekeeping duties to maintain the partnership during 1973. Although plaintiffs might well be entitled to a remand on that issue, they expressly waived (at oral argument) any right to such a remand—the amount involved is too small. For the purposes of this particular case, they accept the conclusion that they are not entitled to any recovery on account of the SPI fee.[19]

CONGRESSIONAL HOUSING POLICY

Finally, we note that plaintiffs contend that disallowance of the immediate deduction of all the expenditures at issue will thwart congressional housing policy by making investment in these partnerships financially less attractive to private investors. Plaintiffs point out that Title IX (42 U.S.C. §§ 3931 *et seq.*) of the Housing and Urban Development Act of 1968 (Pub.L.No. 90–448, § 201, 82 Stat. 476 (of which Section 236 was a part)) was enacted to encourage private investors to provide housing for low and moderate income families, and that Congress envisioned tax benefits making the ventures attractive.

However, plaintiff has pointed to nothing in the legislative history indicating that Congress intended partnerships operating under Section 236 to receive any tax benefits beyond those generally available to other taxpayers under existing tax law principles. Indeed, the Senate Committee report on the legislation indicates the opposite:

The partnership arrangement makes it possible to assure an adequate return to investors. *Under existing Internal Revenue Service regulations and rulings,* partnership losses for tax purposes flow to the individual partners * * *. Assuming the member of the partnership is in [a] relatively high income tax bracket, his share of the depreciation losses, plus cash income from project operations would provide an after-tax return on his investment which would compare favorably with the return which most industrial firms realize on their equity capital.

(Emphasis supplied.)   S.Rep.No.1123, 90th Cong., 2d Sess. 85 (1968)

In addition to the accelerated depreciation methods available under I.R.C. § 167, Congress provided federal insurance and a secondary market for Section 236 mortgages. It also granted them preferential treatment by subsidizing the mortgage to a level of 1 percent interest.

When Congress felt that Section 236 programs needed additional benefits, they so provided, *e.g.,* favorable depreciation recapture under I.R.C. § 1250(a) (1976), deferred gain on sale or disposition under I.R.C. § 1039(b) (1976), and postponed application of the rule on 10-year amortization of real property construction period interest and taxes under I.R.C. § 189 (1976).

In the Tax Reform Act of 1976 (Pub.L. No.94–455, § 208, § 213(b)(1), 90 Stat. 1520, 1541, 1547 (1976)), Congress amended I.R.C. § 461(g) to deny expressly current deductions for interest prepaid by a cash basis taxpayer (except for points paid by one purchasing his own principal residence) and added I.R.C. § 709 to bar current deductions for expenditures for organization of partnerships and sales of partnership interests. In neither instance did it make any exception for Section 236 partnerships.

19.  The trial judge held that plaintiffs had furnished no basis for a rational allocation of deductible from non-deductible compensation, and that accordingly they had failed to carry their burden of showing a deduction. We ac-

cept the first of these holdings but not necessarily the latter; it may be (we do not decide) that plaintiffs are legally entitled to a remand for further proof on the question of allocations.

Absent a clear indication that Congress intended partnerships operating under Section 236 to be entitled to tax benefits not accorded to other taxpayers, there is no warrant for reading such benefits into the tax law.

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, this case is remanded to the Trial Division for determination, under Rule 131(c), of the amount of plaintiffs' recovery, if any.